UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AGGREGATE INDUSTRIES-NORTHEAST          )
REGION, Inc.,                           )
                                        )
        Plaintiff,                      )
                                        )     CIVIL ACTION NO.
v.                                      )     09-11939-DPW
                                        )
TEAMSTERS LOCAL UNION NO. 42,           )
                                        )
        Defendant.                      )

MEMORANDUM AND ORDER
December 30, 2010

Plaintiff Aggregate Industries-Northeast Region, Inc.
("Aggregate") seeks to vacate an arbitration award issued in
favor of Teamsters Local Union No. 42 (the "Union"), sustaining a
grievance filed against Aggregate for unilaterally reassigning
work outside of a bargaining unit.  Both Aggregate and the Union
have moved for summary judgment.  Applying the high degree of
deference generally accorded to arbitral awards, I will grant the
Union's motion, accept as to attorney's fees and costs, and deny
that of Aggregate.

## I.  BACKGROUND

### A.  *The Parties*

Aggregate is an employer in an industry affecting commerce
within the meaning of Section 301 of the Labor Management
Relations Act of 1947 (the "LMRA"), codified as 29 U.S.C. § 185.
Specifically, Aggregate operates a quarry in Swampscott,

1

Massachusetts. Multiple bargaining units are located on this quarry; one unit employs quarry drivers and another employs operating/hoisting engineers, also known as "loaders".

The Union is an organization representing certain employees in an industry affecting commerce within the meaning of the LMRA. In this capacity, the Union represents both the quarry drivers and the operating engineers employed by Aggregate at the Swampscott quarry.

**B. *The Facts***

1. <u>The Parties' Collective Bargaining Agreement</u>

The present dispute is governed by the collective bargaining agreement between Aggregate and the Union in effect from May 1, 2008 through April 30, 2011 (the "CBA" or the "Agreement"). The purpose of the Agreement is "to promote harmonious relations between the Employer and its [drivers] and to establish proper standards of wages, hours, and other working conditions." CBA, Art. 1.

The core of this case focuses on the Management Rights clause set forth in the CBA, as well as on the circumstances surrounding the adoption of this clause by the parties. During the negotiations that led to the adoption of the previous collective bargaining agreement, Aggregate had made a proposal to obtain "the right to direct loaders to feed bins, hoppers, and crushers in order to continue plant operations." In light of the

2

Union's opposition, Aggregate withdrew its proposal. As a result, the previous collective bargaining agreement did not contain *any* express provision related to such management rights for Aggregate.

During the negotiations of the CBA, Aggregate attempted to introduce a broad "Management Rights" clause, which read as follows:

> It is understood that the Employer shall have the exclusive control of its operation. Nothing in this Agreement shall be deemed to limit the Employer in any way in the exercise of the regular and customary functions of management, including among other things, the direction of the working force; the establishment of methods of operation including the assignment of concrete and asphalt delivery destinations; the promotion and demotion of employees; to maintain or improve the efficiency of operations; the adoption of standards of performance rate and quality; *to determine the personnel, methods, means and facilities by which operations are conducted;* the right to hire, reprimand, suspend or discharge or otherwise discipline for just cause; the right to select or employ supervisory employees, including foreman and their assistants; *the right to transfer or relieve from duty because of lack of work;* the right to determine from time to time the number of hours worked per day and per week; *to control and regulate the use of machinery, facilities, equipment and other property of the Employer;* to issue, amend and enforce work rules, policies and practices; and the right to sell out or transfer, in whole or in part, any of its operations for valid business reasons. The Employer agrees that these functions will be exercised in a manner not inconsistent with the provisions of the Agreement.

(emphasis added.) In addition, Aggregate proposed the following clause entitled "Completeness of Agreement" or "Zipper Clause:"

> This Agreement contains the complete and exclusive Agreement between the Employer and the Local and

represents all matters agreed to by them during negotiations. The terms of the Agreement shall be construed according to their plain, ordinary meanings and neither for nor against either party. *Past practice and course of dealings shall not be a basis for creating a right or benefit that is not clearly and expressly provided for or created by the provisions of the Agreement and shall not alter the plain, ordinary meaning of the terms of the Agreement.*

(emphasis added.)

The Union rejected both provisions. The Zipper Clause was not incorporated in the CBA and the Management Rights clause of the CBA was limited as follows:

The Employer shall exercise the normal and customary functions of management subject to the provisions of this agreement. Management rights include the direction of the workforce; *to determine the personnel, methods, means and facilities by which operations are conducted;* the maintenance of efficient operations; the adoption of reasonable work rules and polcies [sic] to manage performance and quality; and *the right to control and regulate the use of machinery, facilities, equipment and other property of the Employer.* The Employer agrees that these functions will be exercised in a manner not inconsistent with the Agreement.

CBA, Art. 25 (emphasis added).

Distinct and separate from the Management Rights clause, the Agreement also provides a "Grievance and Arbitration Procedure" applicable when either party alleges a violation of the CBA. *Id.* at Art. 8. Pursuant to this procedure, the parties shall first use reasonable efforts to settle the grievance between themselves. *Id.* at Art. 8.3. If the grievance remains unsettled despite the parties' efforts, the matter shall be submitted to an

4

arbitrator. *Id*. at Art. 8.6. In reaching his decision, the arbitrator "shall have no power to amend, modify, alter, subtract from or add to this Agreement unless the parties mutually agree in writing to give him specific authority to do so." *Id*. The award of the arbitrator "shall be final and binding on the parties." *Id*.

    2.  <u>The Type of Activities Involved</u>

When in operation, the Swampscott quarry handles a variety of products, including dust material. The purpose of the operation, when dust material is involved, is to transfer dust from a stockpile to a dust washing system, called the wash plant conveyor.

Prior to the grievance at issue, Aggregate used two[1] methods to load the conveyor.

The *first* method required a large metal bin to feed 50-70 tons of material onto the wash plant conveyor. An operating engineer loaded dust material using a front end loader into a haul truck operated by a quarry driver, who then dumped the material into the large bin which fed the conveyor.

---

[1] Aggregate also contends that other methods were historically used at the Swampscott quarry to feed the wash plant conveyor, including (A) via a tunnel system, or (B) via a jump conveyor system located between the crusher and the wash plant bin. Neither of these methods required, according to Aggregate, the use of quarry drivers. They are not directly at issue in this case.

Under the *second* method, an operating engineer directly loaded dust into a smaller 15-ton portable bin and emptied its content into the conveyor. The second method did not require any quarry driver.

On July 7, 2008, the Spanish sister company of Aggregate experienced a multiple fatality incident due to the failure of a weld on a suspended steel structure. Following this incident, Aggregate's parent company commenced a worldwide safety inspection of all suspended steel structures. As part of this investigation, an independent engineering firm was retained to inspect the large bin used to transfer dust at the Swampscott quarry.

The engineering firm issued a report providing the results of its inspection on April 8, 2009 (the "Independent Report"). In this report, the engineering firm concluded that:

> To answer your initial question regarding the safe operation of the structure we are of the opinion that based on our visual evaluation of the bin condition, the structure is not safe to use without further detailed evaluation and repairs.
>
> Until then we recommend to suspend any further use of the structure.
>
> . . . .
>
> . . . we are confident that a detailed study would confirm that the bin structure does not meet the Massachusetts State building code requirements and would require very significant repairs/modifications to both the steel structure, and quite possibly, the foundations.

In light of the Independent Report, Aggregate decided to discontinue the first method used to transfer dust and use the smaller bin exclusively instead. To justify this change of method, Aggregate contends that, given the size of haul trucks used by the quarry drivers, the use of these trucks could cause the smaller bin to collapse. The only safe way to load the smaller bin is, according to Aggregate, to use front end loaders operated by hoisting engineers to dump the dust directly into the bin, a method which, as discussed above, did not require quarry drivers.

### 3. The Underlying Grievances and Related Arbitration Awards

The Union filed two series of grievances against the implementation by Aggregate of the second method to transfer dust at the Swampscott quarry. These two series of grievances gave rise to two successive arbitration proceedings. It is the second award that is the subject of the present appeal. In order to provide content, I begin by discussing the first arbitration.

#### a. *First Arbitration*

The first series of grievances were filed by the Union beginning on May 23, 2008, before the Spanish fatality incident. These grievances were submitted to arbitration pursuant to the procedure set forth in the Agreement. The questions before the selected arbitrator, John J. Mark, (the "Arbitrator") were: "Did

the company violate the Collective Bargaining Agreement when it changed the method of operating on May 23, 2008? If so, what shall the remedy be?" *Award I*, p. 2.

A hearing was held before the Arbitrator on December 18, 2008. During this hearing, the Union argued that prior to May 23, 2008, quarry drivers had always done this work. Aggregate countered that the use of the operating engineers to feed the wash plant with a portable bin was a more efficient and economical method. Aggregate also contended that this change of method was allowed under the Management Rights clause of the CBA.

The Arbitrator issued a first award on February 27, 2009 in favor of the Union ("*Award I*"). In this award, the Arbitrator ordered that "the terms of the contract be complied with and that any employee affected by this change, be made whole." *Id*. at 8. The rationale for the Arbitrator's decision was that "the employer [had] unilaterally changed the system of making product to the determent [sic] of the quarry drivers" and that, in doing so, "the company [had] tried to get the leeway it want to make those changes in negotiations and was unsuccessful." *Id*. at 7. Aggregate did not seek to vacate *Award I*.

b. *Second Arbitration*

Beginning on April 10, 2009 - two days after the Independent Report was issued - the Union filed a second series of grievances against the renewed use by Aggregate of operating engineers to

feed the wash plant with a portable bin.  As with the first arbitration, the questions before the Arbitrator[2] were: "Did the Company violate the Collective Bargaining Agreement?  If so, what shall the remedy be?"  *Award II*, p. 2.

A second arbitration hearing was held on July 22, 2009.  At this hearing, the Union claimed that "this is yet another case of engineers doing quarry driver work."  According to the Union, Aggregate was therefore obliged either to repair or to replace the large bin with another large bin in order to comply with the Agreement.[3]  For its part, Aggregate contended that attempting to repair the bin would not necessarily make it safe given the concerns raised in the Independent Report.  Aggregate also contended that the smaller bin could only be loaded by the front end loaders operated by hoisting engineers, and not by the haul trucks operated by quarry drivers.  Again, Aggregate argued that, any event, the change of method was allowed under the Management Rights clause set forth in the CBA.

The Arbitrator issued a second award on October 20, 2009 sustaining the grievance against Aggregate ("*Award II*").  In this award, the Arbitrator ordered, as he did in *Award I*, that "the

_____

[2]  In both arbitration proceedings, the selected arbitrator was John J. Mark.

[3]  The parties acknowledged that the replacement of the large bin would cost Aggregate between $100,000 and $150,000 and its repair between $50,000 and $75,000.

terms of the contract be complied with and that the company stop trying to circumvent the [CBA]." *Id.* at 1. He further instructed that "any employee affected by this change be made whole." *Id.* In reaching this conclusion, the Arbitrator noted that "[t]he management rights clause clearly does not contain a provision allowing the company the right of reassignment of work out of the bargaining unit." *Id.* at 8. As a basis for this result, the Arbitrator noted that "the company submitted proposals in negotiations that would give the company the leeway that it wanted in assigning work, but the union rejected these proposals." *Id.* He also noted the existence of "a long history of the rule of the haul truck drivers and the quarry engineers." *Id.*

Aggregate filed a complaint on November 12, 2009 seeking to vacate *Award II* on the ground that the Arbitrator exceeded the scope of his authority by misinterpreting the plain language of the Agreement. In its Answer, the Union counterclaimed to enforce *Award II*.

## II.  STANDARDS OF REVIEW

### A.  *Summary Judgment*

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." FED.
R. CIV. P. 56(c). The vocabulary applicable to this rule is
well-settled. "A genuine issue is one that could be resolved in
favor of either party, and a material fact is one that has the
potential of affecting the outcome of the case." *Vera v. McHugh*,
622 F.3d 17, 26 (1st Cir. 2010) (quoting *Calero-Cerezo v. U.S.
Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

Cross-motions for summary judgment do not alter the summary
judgment standard, but instead requires the court "to determine
whether either of the parties deserves judgment as a matter of
law on facts that are not disputed." *Sch. Union No. 37 v. United
Nat'l. Ins. Co.*, 617 F.3d 554, 559 (1st Cir. 2010) (quoting
*Littlefield v. Acadia Ins. Co.*, 392 F.3d 1, 6 (1st Cir. 2004)).
"'Where, as here, cross-motions for summary judgment are filed
simultaneously, or nearly so, the district court ordinarily
should consider the two motions at the same time,' thereby
applying the same standards to each motion." *Wells Real Estate
Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship*, 615 F.3d 45, 51
(1st Cir. 2010) (quoting *P.R. Am. Ins. Co. v. Rivera-Vázquez*, 603
F.3d 125, 133 (1st Cir. 2010)).

**B.  *Labor Arbitration Awards***

When the parties agree to submit a dispute to binding
arbitration, "it is the arbitrator's view of the facts and of the
meaning of the [collective bargaining agreement] that they have

11

agreed to accept." *United Paperworkers Int'l Union, AFL-CIO v.*
*Misco, Inc.*, 484 U.S. 29, 37-38 (1987). As a result, "the
district court's review of arbitral awards must be extremely
narrow and exceedingly deferential." *UMass Mem'l Med. Ctr., Inc.*
*v. United Food & Commercial Workers Union, Local 1445*, 527 F.3d
1, 5 (1st Cir. 2008) (quoting *Bull HN Info. Sys., Inc. v. Hutson*,
229 F.3d 321, 330 (1st Cir. 2000)) (internal quotation marks
omitted). The task of a court "is to determine whether the
arbitrator exceeded his authority by failing to apply the
contract in a plausible manner." *Salem Hosp. v. Mass. Nurses*
*Ass'n*, 449 F.3d 234, 238 (1st Cir. 2006) (quoting *Labor Relations*
*Div. of Constr. Indus. of Mass. v. Int'l Bhd. of Teamsters*, 29
F.3d 742, 746 (1st Cir. 1994)). Thus, the mere fact "that a
court is convinced he committed serious error does not suffice to
overturn his decision," so "long as the arbitrator is even
arguably construing or applying the contract and acting within
the scope of his authority." *United Paperworkers*, 484 U.S. at
38.

Notwithstanding this deferential standard, a court is "not
required to give an arbitrator 'carte blanche approval' for every
decision." *Asociación de Empleados del Estado Libre Asociado de*
*P.R. v. Unión Internacional de Trabajadores de la Industria de*
*Automoviles,* 559 F.3d 44, 47 (1st Cir. 2010) (quoting *Challenger*
*Caribbean Corp. v. Unión Gen. de Trabajadores de P.R.*, 903 F.2d

857, 860 (1st Cir. 1990)).  There are two sets of circumstances in which a court may overturn an arbitral award.

The *first* set of circumstances is set forth in Section 10(a) of the Federal Arbitration Act, codified as 9 U.S.C. § 10(a).[4] In essence, this section "authorizes vacatur of an award in cases of specified misconduct or misbehavior on the arbitrators' part, actions in excess of arbitral powers, or failures to consummate the award."  *UMass*, 527 F.3d at 6 (quoting *Advest, Inc. v. McCarthy*, 914 F.2d 6, 8 (1st Cir. 1990)).

---

[4] Section 10(a) of the Federal Arbitration Act provides as follows:

> In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--
>
> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a) (2009).

The *second* set of circumstances is anchored in federal
common law and provides federal courts with the power to vacate
arbitral awards when "(1) an award contravenes the plain language
of the applicable contract or (2) when an arbitrator disregards
applicable law." *Id.* (quoting *Cytyc Corp. v. DEKA Prods. Ltd.
P'ship*, 439 F.3d 27, 33 (1st Cir. 2006)). Phrased differently,
to be enforceable, "the arbitrator's award settling a dispute
with respect to the interpretation or application of a labor
agreement must draw its essence from the contract and cannot
simply reflect the arbitrator's own notions of industrial
justice." *United Paperworkers*, 484 U.S. at 38.

### III. DISCUSSION

The parties' dispute over the enforcement of *Award II* raises
three separate issues: (A) whether *Award I* should be given
precedential effect and govern the present dispute; if not, (B)
whether *Award II* nevertheless independently drew its essence from
the Agreement and is enforceable; and finally, (C) to the extent
*Award II* is enforceable, whether the Union is entitled to
attorney's fees and costs. I will discuss these three issues in
turn.

### A. *Award I Does <u>not</u> Govern the Present Dispute*

At the outset, the Union argues that *Award I* should be given
precedential effect and therefore apply to the present dispute.[5]

---

[5] I note that the Union chose to file a second set of
grievances and submit those grievances to arbitration, rather

14

To justify this result, the Union relies on two decisions from the First Circuit discussing circumstances sufficient to warrant bypass of the normal grievance procedures. *Mass. Nurses Ass'n v. N. Adams Reg'l Hosp.*, 467 F.3d 27 (1st Cir. 2006); *Boston Shipping Ass'n, Inc. v. Int'l Longshoremen's Ass'n*, 659 F.2d 1 (1st Cir. 1981).

First Circuit case law provides a test for when an arbitral award is to be given precedential effect:

> Only where an arbitral award is both [1] clearly intended to have a prospective effect and [2] there is no colorable basis for denying the applicability of the existing award to a dispute at hand, will a court order compliance with the award rather than require the parties to proceed anew through the contract grievance procedure.

*Mass. Nurses*, 467 F.3d at 30 (quoting *Derwin v. Gen. Dynamics Corp.*, 719 F.2d 484, 491 (1st Cir. 1983)).

Applying this standard, the court in *Massachusetts Nurses* found that the original award was prospective, but denied the application of that award on the ground that specific new violations were alleged in the complaint. *Id.* at 31-32.

---

than to seek enforcement of *Award I*. This choice was made knowing that, pursuant to Article 8.6 of the collective bargaining agreement (the "CBA" or "Agreement"), the decision of the arbitrator is "final and binding on the parties." CBA, Art. 8.6. Accordingly, the Union may be estopped from requesting that *Award I* be applied to the present dispute, when another arbitration award, *Award II*, was specifically issued to address the second set of grievances the Union chose to submit to arbitration. Nevertheless, I will discuss the substance of the Union's argument regarding the precedential effect of *Award I* in the text of this Memorandum. As will appear in the text, I find the substance of the precedential argument to be meritless, irrespective of the potential application of an estoppel theory.

The court in *Boston Shipping* also found that the arbitral award applied to future disputes, even though the collective bargaining argument on which it was based had expired. *Boston Shipping* 659 F.2d at 5. The First Circuit has made clear, however, that this result was not the rule, but rather the exception; and it has held the exception is only available when "it is beyond argument that there is no material factual difference between the new dispute and the one decided in the prior arbitration." *Mass. Nurses*, 467 F.3d at 30 (quoting *Boston Shipping*, 659 F.2d at 4).

The instant case does not fall within the exception envisioned by *Massachusetts Nurses* and *Boston Shipping.* While *Award I* arguably satisfies the first prong of the test – i.e., that the award be prospective –,[6] the allegations subject to *Award II* do provide a colorable basis for finding a material factual difference between the new dispute and the one decided in the first arbitration, as required by the second prong. *Boston Shipping*, 659 F.2d at 4. At the time *Award I* was issued, the investigation initiated at the Swampscott quarry was still ongoing; the Independent Report was only issued two months thereafter. That report is material to the present dispute because it raises new safety concerns regarding the large bin at

---

[6] In this regard, *Award I* appears prospective in its provision that "the terms of the contract be complied with and that *any* employee affected by this change, be made whole." *Award I*, p. 8 (emphasis added).

issue.  Safety concerns are material because they could justify a
management change of method to feed the wash plant conveyor and
the transfer of personnel resulting thereof.

Having found a material factual difference[7] between the new
dispute and the one decided in the prior arbitration, I conclude
that *Award I* does not govern the present dispute.

**B.    *Award II Drew its Essence from the CBA***

I turn now to the issue whether *Award II* drew its essence
from the CBA, or simply reflected the Arbitrator's own notions of
industrial justice.  *United Paperworkers*, 484 U.S. at 38.  The
answer depends, in this particular case, on (1) whether the
Arbitrator's interpretation of the Management Rights clause
contained in the CBA is plausible, and (2) whether the
Arbitrator's reliance on Aggregate's past practice is appropriate
in this context.

_____

[7]  Aggregate also claims that another material factual
difference is that the current CBA did not exist at the time the
first set of grievances was filed in May 2008.  The CBA was
formally executed on February 17, 2009 with an effectiveness from
May 1, 2008 through April 30, 2011.  Aggregate contends that the
Arbitrator did not make any reference to the Agreement and to the
Management Rights clause contained therein in the "Discussion and
Findings" section of *Award I*.  However, six of the *Award I*
grievances were filed *after* a Memorandum of Agreement containing
the current Management Rights clause was signed between the
parties on September 30, 2008.  *Award I* shows that the Arbitrator
considered the Management Rights clause between the parties for
purposes of his analysis; Joint Exhibit 1.A referenced in *Award I*
corresponds to the September 30, 2008 Memorandum of Agreement.
*Award I*, pp. 4, 6.  I find Aggregate has failed to raise a
material factual difference on the ground of the chronology on
the developing agreements between the parties.

<u>1.</u>  <u>The Interpretation of the Management Rights Clause</u>

To justify vacatur of *Award II*, Aggregate first argues that
the Arbitrator ignored the plain language of the Management
Rights clause contained in the CBA, which specifically provides
for the right to make determinations regarding the method of
operation and the choice of equipment.  Aggregate relies on the
following provisions of the Management Rights clause in support
of its position:

> The Employer shall exercise the normal and customary
> functions of management subject to the provisions of this
> agreement. Management rights include the direction of the
> workforce; *to determine the personnel, methods, means and
> facilities by which operations are conducted;* . . . ; and
> *the right to control and regulate the use of machinery,
> facilities, equipment and other property* of the Employer.

CBA, Art. 25 (emphasis added).  Disagreeing with Aggregate's
interpretation of this clause, the Arbitrator found that the
Management Rights clause "clearly does not contain a provision
allowing the company the right of reassignment of work out of the
bargaining unit," noting that "arbitrators have ruled against the
companies on countless occasions for assigning work that
historically belonged to other workers."  *Award II*, p. 8.

Generally, "[a]rbitrators are divided on the question of
whether, in the absence of contract provisions to the contrary,
management has the right to assign bargaining-unit work to
employees outside the unit."  ELKOURI & ELKOURI, HOW ARBITRATION WORKS?
757 (6th ed. 2003).

On the one hand, in finding that the management has such a
right, some arbitrators have relied on the absence of specific
contractual limitations. *See*, *e.g.*, *Olin Mathieson Chem. Corp.*,
42 LA 1025, 1040 (Kalmon, 1964) ("[T]he right of the Company to
assign work . . . is one of the fundamental rights of management,
and can only be limited or restricted in direct contract
negotiations. Moreover, such a restriction must be stated in the
clearest terms and then extends only as far as is clearly
stated."); *see also* FAIRWEATHER'S PRACTICE & PROCEDURE IN LABOR
ARBITRATION 306-10 (4th ed. 1999).

Other arbitrators have ruled, as did the Arbitrator in this
case, against the right of management to assign work out of the
bargaining unit, on the ground that such right is not included
within the scope of general management-rights clauses. *See*,
*e.g.*, *W. Va. Pulp & Paper Co.*, 12 LA 1074, 1080 (Copelof, 1949)
("The Arbitrator is unable to conceive that the Management
Clause, wherein the Company reserves all rights, etc.,
customarily exercised by Management, includes the right to . . .
remove the men from the work and replace them with other men who
are not members of the bargaining unit."). The reasoning
underlying this view was articulated as follows:

> Job security is an inherent element of the labor
> contract, a part of its very being. If wages is the
> heart of the labor agreement, job security may be
> considered its soul. Those eligible to share in the
> degree of job security the contract affords are those to
> who the contract applies. . . .

The transfer of work customarily performed by employees
in the bargaining unit to others outside the unit must
therefore be regarded as an attack on the job security of
the employees whom the agreement covers and therefore on
one of the contract's basis purposes.

*New Britain Machine Co.*, 8 LA 720, 722 (Wallen, Knauss, and

Kosinski, 1947).

Still other arbitrators have taken an intermediate view,

considering that certain contractual clauses, such as

recognition, seniority or job security clauses, show an intention

to limit the performance of unit work to unit employees, while

declining to view these types of clauses as absolute

restrictions. *See*, *e.g.*, *Cotton Bros Baking Co.*, 51 LA 220, 223–

24 (Hebert, 1968) (holding that assignment of work outside the

bargaining area was proper where there is "good cause").

Recognizing the variety of arbitrators' approaches, I find

the interpretation of the Management Rights clause provided by

the Arbitrator in this case to be, at a minimum, plausible. *Cf.*

*In re Vital Basics Inc.*, 472 F.3d 12, 17 (1st Cir. 2006) (noting

that a court may "vacate an award where . . . the arbitrator has

construed the contract in a way that cannot possibly be described

as plausible or rational.") (internal quotation marks and

citation omitted).

In concluding that the Management Rights clause did not

encompass the right of Aggregate to assign work outside of the

bargaining unit, the Arbitrator relied on the fact that Aggregate

had submitted proposals in negotiations which would have provided the leeway that it wanted in assigning work, but that the Union had rejected these proposals. *Award II,* p. 8. This conclusion is supported by the evidence of record. Aggregate sought, during the negotiations of the previous collective bargaining agreement, to obtain "the right to direct loaders to feed bins, hoppers, and crushers in order to continue plant operations." This proposal was, however, rejected by the Union. In addition, Aggregate requested the introduction of a broad management rights clause during the negotiations of the CBA. Of importance, that proposed clause expressly included "the promotion and demotion of employees" and "the right to transfer or relieve from duty because of lack of work." Once again, this proposal was rejected by the Union. Such proposals do not reflect agreement of the parties; indeed their rejection evidences lack of agreement.

As a result of the Union's opposition to the proposals made by Aggregate, the current Management Rights clause provides only the right "to determine the personnel, methods, means and facilities by which operations are conducted" and "the right to control and regulate the use of machinery, facilities, equipment and other property." CBA, Art. 25. As noted by the Arbitrator, these provisions do not *clearly* grant Aggregate the absolute right to "reassign/transfer" work out of the bargaining unit. It is true that another arbitrator might have taken a different view

and considered that, absent specific restrictions in the CBA,
Aggregate retained the right of work assignment outside the
bargaining unit, especially in light of the new safety concerns
associated with the large bin. Nonetheless, when the parties
agreed to submit their dispute to binding arbitration, "it is the
arbitrator's view of the facts and of the meaning of the [CBA]
that they have agreed to accept." *United Paperworkers*, 484 U.S.
at 37-38. Even if I were to consider the Arbitrator's
conclusions to be questionable, where he has not acted contrary
to the plain language of the contract, and where he is "even
arguably construing or applying the contract," his award cannot
be overturned. *Id.* at 38.[8]

### 2. The Reliance on Past Practice

A second and closely-related argument raised by Aggregate is
that the Arbitrator improperly relied on the parties' past
practice - i.e., that a quarry driver, rather than an operating

---

[8] Aggregate raises two additional arguments to prevent the
Union from challenging the change of method, both of which are
without merit. *First*, Aggregate contends that, since the Union
agreed to the current Management Rights clause, it essentially
waived its right to challenge the change in operations. Having
found the Arbitrator's interpretation that the current Management
Rights clause did not clearly include the right to transfer
employees to be plausible, I conclude that Aggregate's argument
is meritless. *Second*, Aggregate alleges that being required to
pay a quarry driver, when none is needed, amounts to
featherbedding. In making this argument, Aggregate ignores the
fact that the large bin could be replaced or potentially repaired
to make assignment to a quarry driver safer. In any event,
displacement of quarry drivers from this work requires bargaining
for its adjustment.

engineer, ordinarily loads the dust in the wash plant conveyor.

However, it is well settled that "custom and past practice may [,under certain circumstances,] be held enforceable through arbitration as being, in essence, a part of the parties' 'whole' agreement." ELKOURI & ELKOURI, HOW ARBITRATION WORKS? at 606. The Supreme Court has explained that:

> The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law-the practices of the industry and the shop-is equally a part of the collective bargaining agreement although not expressed in it.

*United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 581-82 (1960); *Senior v. NSTAR Elec. and Gas Corp.*, 449 F.3d 206, 220 (1st Cir. 2006) (same); *see also Providence Journal Co. v. Providence Newspaper Guild*, 271 F.3d 16, 21 (1st Cir. 2001) (holding that arbitrators are allowed "to use past practice as an interpretive device or as relevant evidence"). "[T]o be binding, a trade custom or usage must be so well known, uniform, long established and generally acquiesced to in so as to induce the belief that the parties contracted with reference to it, nothing in the contract to their contrary." *Strathmore Paper Co. v. United Paperworkers Int'l Union, AFL-CIO, Local 197*, 900 F.2d 423, 428 (1st Cir. 1990) (quoting *Georgia Pac. Corp. v. Local 27*, 864 F.2d 940, 946 (1st Cir. 1988)).

The Arbitrator's reliance here on the parties' past practice is not contrary to the terms of the CBA. To be sure, Aggregate

sought, during the negotiations of the CBA, to introduce the so-called "Zipper Clause." The relevant portion of this clause provided that "[p]ast practice and course of dealings shall not be a basis for creating a right or benefit that is not clearly and expressly provided for or created by the provisions of the Agreement and shall not alter the plain, ordinary meaning of the terms of the Agreement." However, the Union opposed the incorporation of that clause in the CBA. Rejection of the clause can hardly constitute implicit adoption.

Aggregate now contends that, regardless of the Zipper Clause, the claim for past practice is "patently contrary" to the express written language of the CBA. But Aggregate does not point to any provision of the CBA that would support its argument. The Management Rights clause alone is insufficient to circumvent the application of past practice under the circumstances. As discussed in Section III.B.1. *supra*, the right to determine the methods by which operations are conducted does not necessarily encompass, in the Arbitrator's view, the right to transfer work out of the bargaining unit. Given that prior to the two sets of grievances, Aggregate generally used quarry drivers, rather than operating engineers, to feed the wash plant conveyor, the Arbitrator's reliance on this past practice was appropriate.

### 3. Conclusion

Having found that the Arbitrator's interpretation of the CBA was plausible and that the Arbitrator properly referred to Aggregate's past practice, I conclude that *Award II* drew "its essence from the contract" and did not "simply reflect the arbitrator's own notions of industrial justice." *United Paperworkers*, 484 U.S. at 38. I now turn to the issue of attorney's fees.

### C. The Union Is not Entitled to Attorney's Fees and Costs

The Union claims that it is entitled to attorney's fees and costs in this case on the ground that Aggregate presented no rational argument to support vacatur of *Award II*, but instead reasserted the same arguments that had previously and properly been rejected by the Arbitrator both in *Award I* and *Award II*.

While "Section 301 of the LMRA does not authorize an award of attorneys' fees as an element of damages, it is established that courts have equitable power to award attorneys' fees in cases brought under Section 301 to enforce arbitration awards." FAIRWEATHER'S PRACTICE & PROCEDURE IN LABOR ARBITRATION at 641. "Under federal common law, a court may award fees and costs to the winning party in a section 301 action if the losing party's position was 'frivolous, unreasonable, or without foundation.'" *Local 2322, Int'l Bhd. of Elec. Workers v. Verizon New England, Inc.*, 464 F.3d 93, 100 (1st Cir. 2006) (quoting *Local 285, Serv.*

25

*Empls. Int'l Union AFL-CIO v. Nonotuck Res. Assoc., Inc.*, 64 F.3d 735, 737 (1st Cir. 1995)).  In other words, a "court has discretion 'to award attorney fees to the prevailing party when the losing party litigated the matter despite the fact that it was unable to present any rational arguments in support of its position.'"  *Painters and Allied Trades Dist. Council No. 35 v. Ipswich Bay Glass Co.*, No. 03-11794, 2004 WL 1212078, at *7 (D. Mass. June 2, 2004) (quoting *Int'l Ass'n of Heat & Frost Insulators v. Thermo-Guard Corp.*, 880 F. Supp. 42, 48 (D. Mass. 1995)).

While Aggregate's basic legal position – that the arbitrator misinterpreted the Management Rights clause contained in the CBA by ruling that the clause does not clearly allow the company to reassign work out of the bargaining unit – was groundless in light of the broad discretion granted to the Arbitrator under the CBA as well as the extremely deferential standard of review applied to arbitral awards, the new material fact concerning safety provided a colorable ground for reconsideration.  Requests for attorney's fees and costs have generally been denied when there has been some justification for pursuing a challenge to an arbitrator's award.  *See, e.g.*, *UMass*, 527 F.3d at 7 (denying the union's request for attorney's fees and costs where "[i]n light of the issue concerning the Hospital's timeliness defense and the question of 'continuous violation,' . . . the district court did not abuse its discretion in its conclusion that the Hospital's

federal claim was sufficiently justified to avoid payment of attorney's fees"); *Local 2322*, 464 F.3d at 100-01 (denying the union's request for attorney's fees and costs where employer's position, that arbitrator's directive was an alteration, rather than a clarification of prior arbitration award, so that it was unenforceable, was "not unreasonable").  I cannot say that Aggregate knew, or should have known, that it had no prospect of prevailing.  *Cf. Ipswich Bay*, 2004 WL 1212078, at *7 (granting the union's request for attorney's fees and costs where "[t]he [c]ompany had no chance of prevailing in this court, and it knew (or should have known) it.").

Finding that Aggregate's position was not so unreasonable and without foundation as to warrant the imposition of sanctions, I conclude that this is not one of those cases where the Union is entitled to the award of attorney's fees and costs.

### IV.  CONCLUSION

For the reasons set forth more fully above, I GRANT the Union's motion for summary judgment on the merits as to the enforcement of *Award II*, but DENY so much of the motion as seeks attorney's fees and costs. (Dkt. No. 12.)  Correlatively, I DENY Aggregate's motion for summary judgment.  (Dkt. No. 13.)


/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE